UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

S.D., individually and as Next Friend of
A.J.D., and M.P., individually and as
Next Friend of O.J.P.,

            **Plaintiffs,**

vs.

ST. JOHNS COUNTY SCHOOL DISTRICT,
GEORGE LEIDIGH, individually and in his
official capacity as Principal of The
Webster School; DAWN CARONNA,
individually and in her official capacity; and
DEBBIE MOORE, individually and in her
official capacity,

            **Defendants.**

_____/

Case No.: 3:09-cv-250-J-20TEM

## ORDER

Before this Court is Plaintiffs' Motion for a Preliminary Injunction (Doc. 2, filed March 17, 2009), Defendants' Response to Plaintiffs' Motion for a Preliminary Injunction (Doc. 5, filed March 20, 2009), and Plaintiffs' Reply (Doc. 14, filed March 26, 2009). This action arises out of an elementary school's class practice and scheduled performance of a song entitled "In God We Still Trust."[1] The song was set to be performed at an end-of-the-year assembly on or around April 30, 2009. As of the issuance of this Order, the school has voluntarily taken the song out of the program and indicated that it will no longer be practiced by the students. However, this conduct

---

[1] "In God We Still Trust" was written and performed by the American country music band Diamond Rio.

by Defendants does not fully address all of the issues raised by Plaintiffs' motion. Since time is not of the essence, this Court has thoroughly and sufficiently reflected upon the weighty principles raised by this motion. This Court has considered the limited evidence before it and determines the following:[2]

## I. BACKGROUND

In or about February of 2009, minors A.J.D. and O.J.P., in conjunction with their public school third-grade class at The Webster School, were provided the lyrics to various songs that they were to perform at an end-of-the-year assembly ("the Assembly"). The Assembly is scheduled to take place on or around April 30, 2009. The students were told that they would regularly practice the songs in class until the date of its performance at the Assembly. Of the three songs selected by the third-grade teachers, one of the songs, entitled "In God We still Trust" ("the Song"), carries the following lyrics:

> You place your hand on His Bible
> When you swear to tell the truth
> His name is on our greatest monuments
> And all our money too
> And when we pledge allegiance
> There is no doubt where we stand
> There's no separation
> We are one nation under Him
> In God we still trust
> Here in America
> He's the one we turn to

---

[2]This Court is clear what this case is not. It is not about the phrase "in God we trust" inscribed upon our currency, the phrase "one nation under God" that is recited by students when they say the Pledge of Allegiance, nor the song "God Bless America" when sung by school children. This Order does not, nor does it attempt to, engage in a discussion of the First Amendment implications of these situations.

2

> When the going gets rough
> He is the source of our strength
> The one who watches over us
> Here in America
> In God we still trust
> Now there are those among us
> Who want to push Him out
> And erase His name from everything
> This country's all about
> From the schoolhouse to the courthouse
> They're silencing His word
> Now it's time for all believers
> To make our voices heard
> In God we still trust
> Here in America
> He's the one we turn to
> When the going gets rough
> He is the source of all our strength
> The one who watches over us
> Here in America
> In God we still trust.

The Song was played during class at least three times and was practiced by the whole class at least once. Additionally, the students were told that if they objected to the Song, for whatever reason, they did not have to sing the Song at the Assembly; however, they were also told that if they did not participate in the practice and performance of the Song, they would be excluded from the Assembly in its entirety.

Following the introduction and subsequent practicing of the Song in their children's third-grade class, the parents of A.J.D. and O.J.P. ("Plaintiffs") filed suit. Their Complaint, filed on March 17, 2009, was accompanied by the instant motion. Plaintiffs argue that the conduct by the teachers, Dawn Caronna and Debbie Moore, the Principal, and the St. Johns County School District (collectively "Defendants") imposed sectarian religious beliefs onto elementary public school students and violated their right to free exercise under the First and Fourteenth

Amendments to the Constitution of the United States. On the day that Plaintiffs filed the
Complaint and Motion for a Preliminary Injunction, the Defendants formally removed the song
from the Assembly roster. Additionally, the Song has not been rehearsed or played in the
classroom since March 12, 2009.

## II. ANALYSIS

### 1. Brief overview of the Establishment and Free Exercise Clauses

Before addressing the elements required for the issuance of a preliminary injunction, it is
important for this Court to set forth a brief history of the First Amendment, which states in
pertinent part, "Congress shall make no law respecting the establishment of religion, or
prohibiting the free exercise thereof. . . ."[3] U.S. CONST. amend. I. The First Amendment, as
incorporated through the Due Process Clause of the Fourteenth Amendment, applies to state and
municipal governments, state-created entities, and state and municipal employees. *Holloman ex*
*rel. Holloman v. Harland*, 370 F.3d 1252, 1268 (11th Cir. 2004). It is well-established that
public school officials are state actors and, as such, their conduct bespeaks government conduct.
*Id.*; *see also Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n.*, 531 U.S. 288, 304
(2001).

Religion has been closely identified with the development of our history and government.
*School Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 212 (1963). "The history of man
is inseparable from the history of religion. . . .The fact that the Founding Fathers believed

---

[3]Hereinafter referred to as the Establishment Clause and the Free Exercise Clause,
respectively.

4

devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings from the Mayflower Compact to the Constitution itself." *Id.* at 212-13. However, "[t]hat is not to say that religion has been so identified with our history and government that religious freedom is not likewise as strongly imbedded in our public and private life." *Id.* at 214. It is, in fact, the religious persecution suffered by our forefathers that makes the freedom to religious opinion a cornerstone of our national identity.[4] It is axiomatic to this identity that "the government [remain] neutral, and while protecting all [religions], it prefers none and disparages none." *Id.* at 215. To that end, the First Amendment, through the incorporation of the Fourteenth Amendment, requires that states be neutral in their relations with religious believers and nonbelievers. Moreover, as an anti-majoritarian document, the purpose of the Bill of Rights is to,

> withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials to establish them as legal principles to be applied by the courts. One's right to freedom of worship and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections. . . .While the Free Exercise Clause clearly prohibits the use of state action to deny the rights of free exercise to anyone, it has never meant that a majority could use the machinery of the State to practice its beliefs.

---

[4] At the time the *Abington* opinion was issued in 1963, there were at least 83 separate religious bodies, not counting less popular religious organizations, functioning within the United States. *Abington*, 203 U.S. at 214. The religious composition of our nation as it stands today,

> makes us vastly more diverse people than were our forefathers. They knew differences chiefly among Protestant sects. Today, the Nation is far more heterogenous religiously, including as it does, substantial minorities not only of Catholics and Jews, but as well of those who worship according to no version of the Bible and those who worship no God at all.

*Abington*, 374 U.S. at 240-41. In light of such changes, it is important to put particular practices in a timely context. Certain behaviors, which may not have been objectionable at the time of our Nations birth, may now be highly offensive to both believers and nonbelievers alike. *Id.*

*Id.* at 226.

To a large extent, the Establishment and Free Exercises Clauses compliment one another. They are both contained within the First Amendment and protect the freedom of religious, or non-religious, beliefs and actions. Yet, there exists a tension between the doctrines, when applied: government action to facilitate free exercise might be challenged as impermissible establishment, and government efforts to refrain from establishing religion might be objected to as denying the free-exercise of religion.[5]

Through a series of cases, the Supreme Court has established a framework for analyzing claims under the Establishment Clause of the First Amendment. The primary test was articulated in *Lemon v. Kurtzman* and has come to be known as the *Lemon* test. 403 U.S. 602 (1971). Under the *Lemon* test, the Establishment Clause is violated if the government's primary purpose is not secular-based, if the principal effect is to aid or inhibit religion, or if there is any "excessive [government] entanglement" with religion. *Id.* at 613. In *County of Allegheny v. ACLU*, the Court clarified,

> [t]he requirement of neutrality inherent in the *Lemon* foundation does not require a relentless extirpation of all contact between government and religion. . . . [However] [i]t may not coerce anyone to support or participate in any religion or its exercise. . . . [T]he government may not place its weight behind obvious efforts to proselytize on behalf of a particular religion.

492 U.S. 573, 576 (1989); *see also Wallace v. Jaffree*, 472 U.S. 38, 70 (1985)(precluding "government from conveying or attempting to convey a message that religion or a particular belief is favored or preferred")(O'Connor, J. concurring). Government neutrality, in the form of the 'endorsement test,' has become widely accepted in evaluating claims under the Establishment

---

[5]Erwin Chimerinsky, *Constitutional Law: Principle and Policies*, 1140 (2d ed. 2002).

Clause,[6] "[i]f government is to be neutral in matters of religion, rather than showing either favoritism or disapproval towards citizens based on their personal religious choices, government cannot endorse religious practices and beliefs of *some* citizens without sending a clear message to the nonadherents that they are outsiders." *Allegheny*, 492 U.S. at 627 (O'Connor, J., concurring in part and concurring in opinion)(emphasis added).

Also of note is the distinction that Courts have made between student-lead prayer or messages and government endorsed religious exercises. Various courts have grappled with what is the appropriate test to determine the extent of government interaction in cases involving the Establishment Clause. In *Borden v. School District of the Township of East Brunswick*, a high school football coach brought an action against a school district for their policy of prohibiting faculty participation in student-initiated prayer. 523 F.3d 153, 159-60 (3d Cir. 2008). In its analysis, the Third Circuit found it unnecessary to analyze whether the plaintiff's conduct violated the Establishment Clause under the *Lemon* test, concluding that it did violate the clause under the 'endorsement test.' *Id.* at 175. The Court looked to the history and context of the coach's prayer activities with the team and determined that his "past conduct signaled an unconstitutional endorsement of religion."[7] *Id.* at 176. The Court noted that the plaintiff's historical involvement "with prayer at these two activities–as a participant, organizer, and

---

[6]However it would be disingenuous to suggest that the Court is unanimous in its adoption of the 'endorsement test.' Moreover, "even Justices who have adopted the 'endorsement test' do not agree on how it should be applied." *Bauchman v. West High Sch.*, 132 F.3d 542, 552 (1997).

[7]For twenty-three years, the plaintiff led the team in pre-game prayer in the locker room. He also appointed the chaplain to say grace before team meals. The practice changed once the school district asked him to stop; he instead directed the chaplain write a prayer and the plaintiff selected a student to read it.

leader–would lead a reasonable observer to conclude that he was endorsing religion." *Id.* The court specifically stated that had the previously discussed historical context been absent, and the plaintiff was bowing his head and kneeling with the students out of a sign of respect for student inspired prayer, its holding may have been different. *Id.*

Conversely, in *Adler v. Duval County School Board*, the Eleventh Circuit found that a school system's policy of permitting a graduating student, elected by her class, to deliver an unrestricted message of her choice at the graduation ceremony was not facially violative of the Establishment Clause. 250 F.3d 1330, 1331-32 (11th Cir. 2001). The Court focused on the board's policy which "explicitly divorces school officials from the decision-making process as to whether any message–be it religious or not–may be delivered at the graduation at all."[8] *Id.* at 1333. Ultimately, the Court found that the decisional control over the most crucial parts of the message rested with the students, and not the state, and as such any message delivered by the student could not reasonably be viewed as the school's endorsement of that message. *Id.*

The paragraphs above have set forth various tests used by courts to determine whether state or federal governments have violated the First Amendment. As this Court discusses more fully below, Defendants' conduct regarding the playing, practicing, and scheduled performance of the Song fails to pass constitutional muster under *any* of the established tests.[9] It is also of note that the analysis is not effected by whether the student was or was not offended by the

---

[8] The school officials in Duval County are, "affirmatively *forbidden* from reviewing the content of the message and are expressly denied the opportunity to censor any non-religious or otherwise disfavored views." *Adler*, 250 F.3d at 1336.

[9] Recall that in *Borden* the Court declined to analyze the plaintiff's conduct under the *Lemon* test, as a violation under the endorsement test alone was sufficient to hold his actions in violation of the First Amendment. 523 F.3d at 175.

school district's conduct. *Lee v. Weisman*, 505 U.S. 577, 598 (1992). The question as to whether certain conduct violates the Establishment or Free Exercise Clause is objective and based on a First Amendment analysis that is largely independent from individual feelings of indignity or personal affront.

## 2. Elements of a Preliminary Injunction

It is with this history in mind, that this Court turns its attention to the present motion. The standards to apply when considering a motion for preliminary injunction are well-settled in this Circuit:

> The movant must demonstrate: (1) a substantial likelihood that he will prevail on the merits of the claim; (2) a substantial threat that he will suffer irreparable harm if an injunction is not issued; (3) that the threatened injury to the plaintiff outweighs any injury an injunction will cause the opponent; and (4) that granting the injunction is not against the public interest.

*Shell Oil Co. v. Altina Associates, Inc.*, 866 F. Supp. 536, 541 (M.D. Fla. 1994), citing *Cheffer v. McGregor*, 6 F.3d 705, 709-710 (11th Cir. 1993) and Fed.R.Civ.P. 65.

## a. Plaintiffs' likely Success on the Merits

Public school officials have long been prohibited by the Establishment Clause from inserting religious exercises into school activities. *Weisman*, 505 U.S. at 579 (1992)(discussing prayer at graduation ceremonies); *Wallace*, 472 U.S. at 48 (prohibiting daily prayer in public classrooms); Stone v. Graham, 449 U.S. 39 (1980)(prohibiting the posting of a copy of the Ten Commandments on public school classroom walls); *Abington*, 374 U.S. at 205 (1963)(refusing to allow Bible reading before class by student volunteers); *Engel v. Vitale*, 370 U.S. 421

(1962)(prohibiting nonsectarian prayer at beginning of the school day); *Karen B. v. Treen*, 653 F.2d 897 (5th Cir. 1981)[10], *affirmed per curiam*, 455 U.S. 913 (1982)(extending class prayer prohibitions to students and teachers)

In *Abington*, the Court held unconstitutional a state law that required daily reading of Bible verses and a recitation of the Lord's Prayer in public schools, despite the school district's assertion of such secular purposes as the "promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature." 374 U.S. at 223. Participation in the exercise was deemed 'voluntary,' as students who did not wish to be present for the morning devotional could be excused, subject to parental consent. *Id.* at 205. In its analysis, the Court dismissed the Defendants' argument that the excusal provision of the statute mitigated any claim that the statute was unconstitutional. *Id.* 289-90. Further, the Court focused on a child's likely reluctance to seek excusal because they are, "disinclined. . . to step out of line or flout peergroup norms." *Id.* at 290.

In *Wallace*, the parent of three public school children brought an action challenging the validity of an Alabama school prayer and meditation statute.[11] 472 U.S. at 42. The plaintiff alleged that the defendant teachers led their classes in saying certain prayers in unison and that the children were exposed to ostracism by their peers when they declined to participate. *Id.* at 41. In affirming the appellate court's finding that the was statute unconstitutional, the Court discussed the important jurisprudential principles embedded in the First Amendment, noting, "a

---

[10]In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), this Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[11]Two of the plaintiff's children were in second-grade and the third was in kindergarten.

system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts. The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" *Id.* at 51.

As in both cases discussed above, the controversy here involves public schools and conduct by school employees that allegedly violates the neutrality requirement of the Establishment Clause. As in *Wallace*, the students were elementary-aged children who were required to speak (or sing) a message that endorsed a specific religious viewpoint, believing in God, while condemning nonbelievers. Not unlike vocal classroom prayer, the students in the present case were asked to sing aloud lyrics that espouse a religious viewpoint contradictory to their own.

Defendants argue that public school choirs are permitted to sing religious songs and therefore, the practicing and performing of one religious song does not rise to the level of a constitutional violation. In support of their argument, Defendants rely on two cases: *Doe v. Duncanville Independent School District*, 70 F.3d 402, 404 (5th Cir. 1995) and *Bauchman v. West High School*, 132 F.3d 542 (10th Cir. 1997).

In *Duncanville*, the court determined that the school district's practice of permitting a high school choir to adopt a Christian theme song did not violate the Establishment Clause. 70 F.3d at 408. The court noted, "[we have] analyzed school-sponsored religious activity in terms of the coercive effects that the activity has on students and the [Supreme] Court's disapproval of government practices that appear to endorse religion." *Id.* at 405. The conduct in question in *Duncanville* arose from Plaintiff's voluntary participation in a middle school and high school

11

choral programs. As a member of the programs, the student was required to sing the Christian-based songs *Go Ye Now in Peace* and *May the Lord Bless You and Keep You.*

This Court recognizes, in accord with *Abington,* that the Establishment Clause does not prohibit choirs from singing religious songs as a part of a secular music program. 374 U.S. at 225. However, in *Duncanville,* the choir director testified that one of the songs was particularly useful to teach students to sight read and sing *a capella.* 70 F.3d at 407. Additionally, the choir director estimated that 60-75 percent of serious choral music is based on sacred themes or text. *Id.* In the case before this Court, it is difficult to find such parallel reasons to support a third-grade class's rendition of a popular country music song. The court in *Bauchman* also noted that a significant percentage of choral music is based on religious themes or texts and reasoned that a music instructor, "would be expected to select any particular piece of sacred choral music, in part, for its unique qualities useful to teach a variety of vocal skills." 132 F.3d 542, 554 (10th Cir. 1997). It also cautioned courts to "resist attributing unconstitutional motives to the government, particularly where we can discern a plausible secular purpose." *Id.*

Defendants also note that "a public school choir does not endorse religion because its choir sings a Christian song." Defs. Resp., Doc. 5, p. 6. However, in the cases on which the Defendants rely, the courts discuss songs with widely recognized musical value sung by middle school and high school *choirs,* not third-grade elementary school *classes.* In both cases above, choir was an elective class, for academic credit, that the student chose to take. Presumably, if a student took issue with the choral selection they could find another elective to take its place, without feeling penalized.

In the case before this Court, the eight year-olds in question were in the same class all

12

day, studied the same curriculum as their classmates, and did not have a choice as to elective classes. The students were given the option as to whether they wanted to perform the Song; however they were told that if they exercised the option to abstain, they would have to forgo participation in the end-of-the-year Assembly. As Justice Clark noted,

> While I do not question the judgment of experienced educators that the challenged practices may well achieve valuable secular ends, it seems to me that the State acts unconstitutionally if it either sets about to attain even indirectly religious ends by religious means, or if it uses religious means to serve secular ends where secular means would suffice.

*Abington,* 374 U.S. at 281. The Supreme Court has suggested that when evaluating a government actor's conduct under the Establishment Clause, the analysis should include the context of the alleged violation. *Allegheny*, 492 U.S. at 597. In the case before this Court, the students were not only excluded from one song, but penalized for their objection by being taken out of the performance altogether.

Defendants also contend that, "the selection, practice and performance of an overtly Christian song is not a *de facto* violation of the First Amendment. . . the one practice and approximately three playings of a recording preceding the voluntary withdrawal of the song. . . [does] not constitute a violation to the First Amendment." Defs. Resp., Doc. 5, p. 7. This Court finds this argument spurious at best. In contrast, the Supreme Court has noted, "[i]t is no defense that the religious practices here may be relative minor encroachments on the First Amendment. The breach of neutrality that is today a trickling stream may all too soon become a raging torrent and. . . it is proper to take alarm at the first experiment on our liberties." *Abington*, 374 U.S. at 225.

The Song fails the neutrality test as it undermines and attacks the fundamental principle

13

of separation of church and state, a principle that underlies the Establishment and Free Exercise Clauses of the First Amendment. The lyrics to the Song state, "there is no separation, we are one nation under Him. . . there are those among us, who want to push Him out and erase His name from everything this country is all about. . . now its time for all believers to make our voices heard." These lyrics endorse a specific viewpoint of preference for religious sectarianism. Further, unlike the songs performed by the high school and middle school choirs, this song antagonizes and degrades those whose beliefs differ from the ones espoused by its lyrics. Moreover, the lyrics from *Go Ye Now in Peace* and *May the Lord Bless and Keep You* were drawn from historical Biblical text; whereas "In God We Still Trust," which was recently released, does not contain such reference. As a patently religious and proselyting piece, the Song fails the 'endorsement test' set forth in *Allegheny* and supports a finding in favor of the Plaintiffs. 492 U.S. at 627.

### b. Plaintiffs will suffer irreparable injury absent an injunction

The next step in this Court's inquiry is to determine whether, at the time the suit was filed, the injury being complained of was capable of being addressed through injunctive relief. *County of Riverside v. McLaughlin*, 500 U.S. 44, 50 (1991). Additionally, the threat of injury must not be conjectural, hypothetical, or contingent. It must be real and immediate, and create a definite threat of future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).

Defendants argue that Plaintiffs do not meet this prong because at the time relief was sought, the remedy Plaintiffs seek, exclusion of the Song, was already in place. Nevertheless, even the briefest infringement of a First Amendment right constitutes irreparable injury. *Elrod v.*

14

*Burns*, 427 U.S. 347, 373-74 (1976)(finding that the "loss of First Amendment freedoms, even for brief periods of time, unquestionably constitutes irreparable injury"). Though Defendants argue that "*Elrod* does not stand for the proposition that a plaintiff need only allege a First Amendment violation to automatically show irreparable harm," Plaintiffs adequately demonstrate that the injunctive relief they seek will prevent future injury. *Bauchman v. West High School, et al.*, 900 F. Supp 248, 251 n.3 (C.D. Utah 1995). Moreover, it is entirely possible that the school district, in response to political pressures by parents and concerned citizens, could decide to reinstate the Song's performance at the Assembly.[12] When considering constitutional protections, this is a hazard that this Court is not at liberty to tolerate. In the instant case, Plaintiffs' loss of rights guaranteed to them by the Establishment Clause of the First Amendment constitutes irreparable injury and militates a finding in favor of Plaintiffs.

**c. Plaintiffs will suffer greater harm without injunctive relief than Defendants would suffer if the injunction were granted.**

In relation to the third prong of the preliminary injunction analysis, the immediate question before this Court is: whose potential harm is greater? Plaintiffs, if the Song were practiced in a class or placed back on the performance schedule for the Assembly, or Defendants, in being enjoined from conduct in which they say they will no longer engage? Justice Black

---

[12]Not surprisingly, Defendants' removal of the Song from the Assembly program has created a heated response by parents and citizens throughout Northeast Florida. If this Court failed to take action, what prevents the superintendent or school board from succumbing to the disquietude of their constituency and making a last-minute decision to include the Song in the Assembly program? If this did occur, this Court may be precluded from taking protective action to safeguard the students' First Amendment rights.

noted that government cannot force a person to, "'profess a belief or disbelief in any religion.' Neither can it constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions grounded on different beliefs." *Torcaso v. Watkins*, 367 U.S. 488, 495 (1961). Therefore, this Court finds that the harm that Plaintiffs would suffer if the Song were to be practiced and/or placed back in the Assembly performance–effectively forcing the students to profess a belief contrary to their own or alternatively to be excluded from the Assembly in its entirety–outweighs any harm that the Defendant would suffer by being enjoined from such conduct. Even if it is established that attendance at the Assembly was voluntary, "the argument that option of not attending the [Assembly] excuses any inducement or coercion in the [Assembly] itself. . . lacks all persuasion." *Weisman*, 505 U.S. at 595.

In addition to the lyrics of the Song itself, this Court expresses its concern that these children, as elementary school students, have a heightened susceptibility to pressures of conformity and possible ostracism. In *Weisman*, a public middle school student and her father brought suit seeking a permanent injunction to prevent the inclusion of invocations and benediction in the form of prayer at graduation ceremonies of city pubic schools. *Id.* at 583. The Supreme Court affirmed the district courts issuance of the injunction, noting that even though the middle school promotion ceremony was completely voluntary, the nonsectarian prayer violated the Establishment Clause.[13] *Id.* at 578-79. In discussing the defendant's impressionability, the

_____

[13]The individual who was selected by the school to give both the invocation and the benediction was a Jewish Rabbi. As was customary, the principal advised the Rabbi that his remarks should be nonsectarian and gave the Rabbi a brochure that suggested appropriate language to be used in his address. During the invocation, the Rabbi referred to God only once and during the benediction, he mentioned God and the Lord, each also only once. Each of the

Supreme Court acknowledged the "conflict of conscience faced by the young student" and charged that society would be "less than true to its heritage if it lacked abiding concerns for its young people." *Id.* at 579, 598. Even Justice Scalia, who advocated on behalf of school prayer in his dissent, indirectly admitted there may be an interest in heightened protection for those students of tender years, "graduation is regarded as [a] significant event. . . it is generally associated with transition from adolescence to young adulthood. . . . Why, then does the Court treat them as though they were first-graders?" *Id.* at 639.

In the instant case, as third-graders the students are more easily influenced by their teachers. They are reliant upon those teachers to reinforce positive social, cultural, and scholastic behaviors. Similarly, they are also extremely sensitive to signs of disapproval and disappointment from the same teachers and their classmates. The slightest hint that they are somehow different from their peers can be very troubling. The *Abington* Court explained,

> By requiring what is tantamount in the eyes of teachers and schoolmates to profession of disbelief, or at least non-conformity, the procedure may well deter those children who do not wish to participate for any reason based upon the dictates of conscious from exercising an indisputably constitutional right to be excused. Thus, the excusal provision in its operation subjects them to a cruel dilemma. In consequence, even devout children may well avoid claiming their right and simply continue to participate. . . because of an understandable reluctance to be stigmatized as atheists or nonconformists simply on the basis of their request.

374 U.S. at 289. In telling eight-year old students, who presumably expressed their right to excusal, that failure to perform the Song would exclude them from the Assembly in its entirety, the Defendants in the instant case ostracized the objecting students from their classmates and

presentations did not extend beyond a minute. *Weisman*, 505 U.S. at 583-84.

effectively penalized them for exercising their constitutional right to object. [14] In essence, Defendants were mandating that all students proselytize a specific viewpoint– that they are believers who should "make our voices heard."

Moreover, the remarks made at the promotion ceremony in *Weisman* were wholly nonsectarian and the Court still found them in violation of the Establishment Clause. The lyrics to "In God We Still Trust" are not only sectarian, but also factional in their assertion by stating that there is no separation between church and state. Moreover, as the Court reasoned in *Weisman*, it is problematic to impart responsibility on "the objector, [and] not the majority, to take unilateral and private action to avoid compromising religious scruples" by electing to miss the Assembly. 505 U.S. at 596. To say that a student, "must remain apart from the ceremony. . . is to risk compelling conformity in an environment analogous to the classroom setting, where we have said the risk of compulsion is *especially high*." *Id* (emphasis added). The third-grade students are being asked to make the same choice here. Even if they choose not to take part in the activity, an option disfavored by the Court in *Weisman*, they would still be exposed to the lyrics of the Song in the classroom, where it is likely that their "conscientious objection" would cause further ostracism from their classmates.

---

[14]As previously discussed, Defendants' removal of the Song from the Assembly program has garnered a fair amount of media attention. One citizen aptly noted "it is very easy to criticize others when your religion is the one in the majority. . . . [P]erspectives change when your religion becomes the minority." http://www.jacksonville.com/community/my_st_johns/sun/2009-04-09/story/in_god_we_still_trust_not_finished_in_court. If First Amendment jurisprudence was subject to the will of the majority, it would effectively make its development by the judiciary moot, as established doctrine would be supplanted by *en vogue* popular opinion. The Bill of Rights was enacted to protect individual liberties, especially if those liberties became controversial or unpopular.

### d. The public interest would be served by enjoining Defendants' acts.

The final inquiry before this Court is whether the public interest would be served by enjoining Defendants' acts. According to Thomas Jefferson, the clause against government establishment of religion was intended to erect a "wall of separation between church and state." *Reynolds v. United States*, 98 U.S. 145, 164 (1879). Additionally, the object of the First Amendment was to "create a complete and permanent separation of the spheres of religion activity and civil authority by comprehensively forbidding. . . public aid or support for religion." *Everson v. Bd. of Ed. Of Ewing Twp.*, 330 U.S. 1, 31-32 (1947). "What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbelieiver or dissenter to be an attempt to employ the machinery of the State to support religious orthodoxy." *Santa Fe Indep. School Dist. v. Doe*, 530 U.S. 290, 312 (2000).

As previously noted, the lyrics to the song take aim at one our nation's fundamental principles: the separation of church and state. The Constitution's prohibition of the state's "establishment of religion" mandates that the government treat religions equally. *Midrash Shepardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1242 (11th Cir 2004). Inherent in this equal treatment is the separation of church and state, which ensures that the government does not make "adherence to religion relevant to a persons standing in the [ ] community." *Id.* By encouraging students to sing "there is no separation, we are one nation under Him," the school is effectively endorsing a religious view that is contrary to well-established constitutional law.

There are those who object to the path that our First Amendment jurisprudence has taken in regards to religion and the state. Under the protections of our Constitution, those individuals

19

are entitled to express their dissent. However, the public interest is well served in preventing the coercion of third-grade students to participate in a *state sponsored* performance that endorses such an opinion. Plaintiffs have adequately satisfied all the requirements for a preliminary injunction. Plaintiffs establish their likelihood on the merits, as public school officials have long been prohibited by the Establishment Clause from inserting religious exercises in school activities. Subject to the rigors of First Amendment analysis, Defendants fail both the *Lemon* and 'endorsement' tests set forth by our Supreme Court. *Lemon,* 403 U.S. at 613; *Allegheny*, 492 U.S. at 627. Additionally, Plaintiffs have shown that they will suffer irreparable injury absent an injunction. Though Defendants have voluntarily taken the Song out of the Assembly, there is no guarantee that the Song will not find its way back into the performance. Moreover, it bears repeating that even the briefest of infringements on First Amendment rights by state actors constitutes irreparable injury. *Elrod*, 427 U.S. at 373-74. As their First Amendment rights have already suffered violation, Plaintiffs would suffer greater harm without injunctive relief if the violation were repeated than would Defendants in being enjoined from such conduct. Finally, it is in the interest of the public interest for this Court to protect the students' First Amendment freedoms by enjoining the Defendants from playing, practicing, or performing the Song in the classroom or at the Assembly.

### 3. Mootness and the Voluntary Cessation Doctrine

Defendants argue that the Plaintiffs are unable to satisfy the requirements for a preliminary injunction analysis because Plaintiffs, amongst other things, have failed to prove that they will suffer imminent and irreparable injury absent an injunction. In support of their

argument, Defendants note that the remedy sought is already in place (ie. . . the performance of the Song has been removed from all practices and the Assembly), and thus indirectly challenge the Plaintiffs standing to request such relief.

Article III of the Constitution limits the jurisdiction of the courts to actual cases and controversies, "[a] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief. If events that occur subsequent to the filing of a lawsuit. . . deprive the court of the ability to give the plaintiff. . . meaningful relief, then the case is moot." *Troiano v. Supervisor of Election in Palm Beach County*, 382 F.3d 1276, 1282 (11th Cir. 2004). Nevertheless, it is important to note that voluntary cessation provides an important *exception* to the general rule that a case is mooted by the end of the offending behavior." *Id.* at 1282. Moreover,

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways. In accordance with this principle. The standard [ ] announced for determining whether a case has been mooted by the defendant's voluntary cessation is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.

*Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1183-84 (11th Cir. 2007)(citing *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). The party asserting mootness bears a "formidable and heavy burden" of persuading the court that the conduct could not reasonably be expected to occur again. *Id.* Defendants' assurance that they will not continue the conduct at issue is "one of the factors to be considered in determining the appropriateness in granting an injunction against the non-discontinued acts." *Sheely*, 505 F.3d at 1184. Though government actors are, in some instances, granted a rebuttable presumption that the conduct will

21

not recur, courts have found injunctive relief appropriate when school districts are a party to controversies involving the First Amendment. *Jager v. Douglas County Sch. Dist.*, 862 F.2d 824 (11th Cir. 1989)(holding that voluntarily ceasing pre-game prayer upon the filing of a lawsuit did not render the school board's conduct moot); *Hall v. Bd. of Sch. Com'rs of Conecuh County*, 656 F.2d 999, 1000 (5th Cir. 1981)(finding action not mooted by school board's voluntary cessation of morning devotionals upon the filing of a lawsuit).

Defendants' declaration that it has no intention of resuming classroom practices or Assembly performance of the Song does not strip Plaintiffs' of their standing to move for a preliminary injunction barring such conduct. Defendants offer no other evidence, beyond the sworn affidavit of the school's principal,[15] that the Song will not be practiced or performed. However, Defendants decline to stipulate to a preliminary injunction that would guarantee that playing or practicing the Song would be prohibited. This is insufficient to overcome the formidable burden that Defendants bear in convincing this Court that the conduct could not reasonably be expected to occur again. Moreover, Defendants mistakenly contend that stipulating to a preliminary injunction would make it more difficult to defend their claim, asserting that doing so would be tantamount to admitting that their conduct was somehow unconstitutional. This is not the case. Defendants have ample opportunity to defend their actions against a permanent injunction or money damages as the suit proceeds. Therefore, this Court finds that the Defendant's voluntary cessation of the practice at issue is not enough to render

---

[15]After the hearing for the preliminary injunction had already taken place, Defendants filed affidavits in support of their position. Based upon Local rule 4.06(b)(3) and Fed. R.Civ.P. 6(c)(2), Defendants filed these affidavits out of time. They were stricken from the record and this Court did not consider them when ruling on the present motion.

moot Plaintiffs' request for, and this Courts issuance of, a preliminary injunction.

## III. CONCLUSION

The Supreme Court has acknowledged that, "every state action implicating religion is [not] invalid if one or a few citizens find it offensive. . . offense alone does not [ ] show a violation." *Weisman*, 505 U.S. at 598. Nevertheless, it is well-established that neither a State nor the federal government can use its power or prestige to aid religion or prefer one religion over another. When, as in the instant case, the public school selects the Song that the students will perform, the Song has a sectarian and proselytizing message, the Song is to be performed at a public school event that is planned, supervised, and given by the school officials, and the school pressures the students to attend and participate in singing the Song, than it is clear that the government is advancing and promoting religion.[16] *See Weisman*, 505 U.S. at 603 (Blackmun, J., concurring). Defendants are incorrect in asserting that the Song has a valid secular purpose that

---

[16]It is likely that this Order will cause varied responses by those following this case; however, this Court finds wisdom in the thoughts of a school board member who faced a similar controversy,

One of the foundations of our democracy is that the right of someone to express concern or to bring a matter of discomfort to the attention of authority is to be respected and protected. It is not to be vilified and dishonored. Some of the extreme language, hateful emails, and inappropriate and inaccurate reporting of this story has shifted blame onto the blameless and has distorted beyond measure the matter at hand. If we can do one thing together as a community, it should be to stand up in vast numbers and express outrage and concern against those who would cheapen the actions of brave and committed Americans. No person should have to be afraid to express their constitutionally protected individual rights. Hopefully, we can all learn from this experience and move forward with dignity and respect for each other.

*Borden*, 523 F.3d at 162.

eclipses a merely incidental religious reference. The challenged song is not a sacred example of a choral music used to instruct students in music theory and appreciation. It is a modern, American county music song overtly espousing a specific religious viewpoint and attacking of those who do not share in the same belief. Additionally, the song degrades the doctrine of governmental separation from and neutrality towards the promotion of religious ideologies. It is with these ideas in mind that this Court finds Plaintiffs entitled to a preliminary injunction which bars the school board, and its employees, from re-introduction of the Song into the classroom or the Assembly performance schedule.

Therefore it is **ORDERED** and **ADJUDGED**:

1. Plaintiffs' Motion for a Preliminary Injunction is hereby **GRANTED**.

2. Defendants and the Defendants' officers, agents, servants, employees, attorneys and all other persons in active concert or participation with Defendants are hereby **PRELIMINARY ENJOINED** from directing or causing public school students at The Webster School to rehearse or perform the song entitled "In God We Still Trust."

**DONE** and **ENTERED** in Jacksonville, Florida this _15_ day of April, 2009 at 4:32 PM

Harvey E. Schlesinger
United States District Judge

Copies to:
D. Gray Thomas, Esq.
Matthew R. Kachergus, Esq.
William J. Sheppard, Esq.
Frank D. Upchurch, III, Esq.
John David Marsey, Esq.
Richard Q. Lewis, III, Esq.
Robert Jacob Sniffen, Esq.